IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:09cr190 |
| ) | |
| JAIME NOEL AYALA ARRIAZA ) | |

## MEMORANDUM OPINION

At issue in this single-count prosecution for unlawful possession of a firearm by an illegal alien is whether the "automobile exception" to the Fourth Amendment's warrant requirement permits a warrantless search of a clearly operational vehicle seized during a lawful traffic stop and held at a privately owned impound lot where, as here, it is undisputed that the officers who conducted the search had probable cause to believe that the vehicle contained contraband—namely, a firearm unlawfully in the arrestee's possession.

For the reasons stated below, the warrantless search at issue was permissible pursuant to the automobile exception because the impound-lot search in this case was supported by probable cause and was conducted on a readily mobile vehicle. Accordingly, defendant's motion to suppress the firearm found in his vehicle during that search must be denied.

I.[1]

Defendant Jaime Noel Ayala Arriaza is a Guatemalan citizen illegally present in the United

---

[1] The facts recited here are found pursuant to Rule 12(d), Fed. R. Crim. P., and are derived from (i) the live testimony of two law enforcement officials at an evidentiary hearing in this matter on June 19, 2009; and (ii) the undisputed facts, reflected in the parties' pleadings and found from the Bench at the June 19 hearing. *See* Def's Supplemental Mem. in Supp. (Docket No. 27), Ex. 2 (June 19 Hr'g Tr.)

States. In 1991, he entered the United States unlawfully, and in 1993, the immigration judge presiding over defendant's removal proceedings granted him permission to depart voluntarily from this country. Yet, defendant did not do so; instead, the record reflects that defendant has remained in the United States illegally since that time. On March 23, 2009, the date of his arrest and the search at issue, defendant lived with his wife[2] at the couple's residence in Herndon, Virginia. Defendant and his wife were also registered owners of a 2002 blue Ford Taurus. The record reflects that because defendant's wife did not have a driver's license, defendant was the sole user of the vehicle and the only person with keys to the vehicle.

On March 23, 2009, defendant's wife called the Herndon Police Department ("HPD") to report a threat and to inform the police that defendant was in the country illegally. That same day, defendant's wife met with an HPD officer at the Herndon police station. Using an individual who had accompanied her as a translator, she told the officer that approximately two years earlier, defendant's mother had been killed in an accident while walking on a street in Fairfax County, Virginia. She further explained that defendant, who had been ordered removed from the United States, had recently returned to their residence in Herndon with a firearm. She also told the HPD officer that defendant had told her that before he was removed he was going to kill the person who killed his mother. Defendant's wife further stated to the HPD officer that she believed her husband was dangerous and that he had already driven through the neighborhood of the person involved in the accident with his mother. Finally, defendant's wife told the HPD officer that she thought defendant kept the firearm in his car.

After the meeting, the HPD officer confirmed, through law enforcement databases, that

---

[2] Defendant's wife is now deceased.

-2-

defendant's mother had, in fact, been killed in a pedestrian accident in Fairfax County. The HPD officer also confirmed, through another officer's communications with Immigration and Customs Enforcement ("ICE") Special Agent Brendan Shelley, that defendant was an illegal alien who had been granted voluntary departure in 1993. Thereafter, Special Agent Shelley, who testified at the suppression hearing in this matter, and an HPD officer began surveillance of defendant's residence.

At approximately 6:00 p.m. on March 23, 2009, Special Agent Shelley and the other officer conducting surveillance observed a male individual matching defendant's description leaving defendant's residence in a 2002 blue Ford Taurus, which law enforcement databases confirmed was the vehicle registered to defendant and his wife. Special Agent Shelley and the other officer then followed the vehicle and observed it changing lanes without using a turn signal, at which point the officers initiated a traffic stop in or about the 200 block of Elden Street, a heavily traveled road in Herndon. After identifying defendant as the driver of the vehicle, the officers placed him under arrest as an alien illegally in the United States. Special Agent Shelley, who is bilingual, then properly advised defendant of his *Miranda* rights in both English and Spanish, and defendant was transported to the Herndon police station.[3] Defendant then agreed to answer questions without an attorney present and admitted that he was unlawfully in the United States. In addition, defendant denied owning a firearm and signed a written form consenting to a search of his residence.

Meanwhile, as defendant was being arrested and transported to the police station, other HPD officers arrived at the 200 block of Elden Street to assist in the traffic stop. One of those officers, HPD Officer Justin Dyer, testified at the suppression hearing in this matter that he was asked to

---

[3] Although the record is somewhat unclear with respect to where defendant was advised of his *Miranda* rights (at the roadside or at the station), any distinction is immaterial, as defendant does not dispute that he was properly and timely advised of his rights.

conduct an on-scene inventory search of defendant's vehicle, which was to be towed to an impound lot.[4] Officer Dyer testified that he did so pursuant to HPD protocol for such searches, which protocol includes filling out a standardized form with the number "6143" written at the top and listing on that form any valuable items found in readily visible areas of the vehicle. Officer Dyer completed a 6143 form at the scene, and that form, which is included in this record, lists several items found in defendant's vehicle during the roadside search, including a machete and various other tools and effects. In addition to inventorying the items found, the 6143 form also noted (i) that the vehicle was impounded at 6:23 p.m. as a result of defendant's arrest, (ii) that the vehicle was towed by a towing company called "Henry's," and (iii) that the vehicle "may be released to owner upon proof of ownership and payment of towing and storage fees." *See* Def's Supplemental Mem. in Supp. (Docket No. 27), Ex. 1.[5] Although Officer Dyer did not find any firearms in the course of the on-scene inventory search (and thus did not list any firearms on the 6143 form), he testified that he was unable to complete the inventory search because he was nearly struck on three occasions by vehicles traveling down Elden Street. The record reflects that at some point after Officer Dyer completed the 6143 form, defendant's vehicle was towed by "Henry's" to an impound lot in Sterling, Virginia. Officer Dyer testified that in accordance with the customary procedure for such impoundments, the vehicle's keys were turned over to the representative from the towing company at that time.

---

[4] Defendant does not dispute the officers' authority to impound his vehicle.

[5] Notably, the 6143 form also has several other boxes, none of which were checked in this case, indicating other possible scenarios in which a vehicle can be seized and/or impounded, including (i) that a vehicle has been "seized and will be held pending judicial disposition" pursuant to various Virginia code sections; and (ii) that a vehicle is impounded for a thirty-day administrative hold, pursuant to Virginia law, with a given release date. *See* Def's Supplemental Mem. in Supp. (Docket No. 27), Ex. 1.

After leaving the scene of the traffic stop, Officer Dyer met with Special Agent Shelley and another HPD officer, and the three returned to defendant's residence to search for the firearm previously mentioned by defendant's wife. In addition to defendant's consent form, which defendant had signed at the police station, the officers also obtained defendant's wife's consent to search the residence. The officers did not locate any firearm in the residence, and when they advised defendant's wife of this fact, she insisted that the firearm was in the impounded Ford Taurus.[6] At that point—at or around 8:30 p.m., still on March 23, 2009—Special Agent Shelley and Officer Dyer left defendant's residence and drove to the impound lot in Sterling, Virginia.

Officer Dyer testified that the privately owned impound lot in question was surrounded by a fence but was not locked when he and Special Agent Shelley arrived. The record reflects that on arriving at the lot, the officers obtained the vehicle's keys from the lot's operators. Officer Dyer further testified that although he and Special Agent Shelley had to weave through several fences to get to defendant's vehicle, the vehicle was positioned in a location where it would be possible to start the vehicle (either with keys or by hot-wiring it) and to drive it out of the impound lot.[7] On reaching the vehicle, Officer Dyer began to search the vehicle's trunk, and he observed that a portion of the trunk's side interior carpeting had been pulled loose from the vehicle's metal frame such that it was sitting open. Officer Dyer testified that he looked in the gap between the carpeting and metal frame

---

[6] Although the record suggests that defendant's wife may have given what Special Agent Shelley and Officer Dyer interpreted to be consent to search the vehicle at the impound lot, the government does not advance a consent-search theory here, and thus that issue is not reached or decided here.

[7] Although Officer Dyer also testified that he understood the lot to be monitored by the towing company's camera system, the record does not suggest that the towing company had any means by which to prevent someone who had started the vehicle from driving it off the lot.

and observed a clear plastic Ziplock bag containing a square box made of heavy cardboard. Officer Dyer further testified that on finding the box, he called out to Special Agent Shelley, indicating that he had found a box that may contain the firearm. Officer Dyer testified that he then removed the box from its resting area and placed it in the middle of the trunk, at which point he noticed that the box had a caliber written on it, further indicating that it may contain a firearm. Special Agent Shelley corroborated this testimony, indicating that he recalled seeing the word "gun" written on the box. The officers then opened the box, which was unlocked, and discovered a semiautomatic pistol and ammunition,[8] which they photographed and took into police custody.

Both Officer Dyer and Special Agent Shelley testified that their intention in searching defendant's vehicle at the impound lot was to discover the firearm that defendant's wife insisted was located in the vehicle. Although Officer Dyer also testified that he intended to continue at the impound lot the roadside inventory search he said he was unable to complete at the arrest scene,[9] the record reflects that neither Officer Dyer nor Special Agent Shelley followed inventory-search procedures at the impound lot. Moreover, neither officer completed an additional or supplementary 6143 form,[10] nor did either officer recall discovering any items other than the firearm in the course

---

[8] Officer Dyer testified that on finding the firearm, a semiautomatic pistol, he cleared one round from the firearm's chamber and removed a magazine which also contained several rounds of ammunition.

[9] In this respect, Special Agent Shelley testified that he did not understand the impound-lot search to be, nor did he conduct any part of the search as, an inventory search to protect valuables in the vehicle.

[10] Although Officer Dyer testified that he referenced the firearm in a supplemental police report, he acknowledged that he did not fill out any supplemental inventory report, and the record reflects that he neither inventoried, nor began to inventory, any additional items during the impound-lot search.

of the impound-lot search.

After discovering the firearm, Special Agent Shelley transported defendant to ICE's office in Fairfax, Virginia, and again advised defendant of his *Miranda* rights. Defendant, who again agreed to answer questions without an attorney present, initially repeated his denial of owning a firearm, but on being shown a photograph by Special Agent Shelley of the firearm found in the vehicle, he admitted that the firearm belonged to him. Special Agent Shelley then filed a criminal complaint and accompanying affidavit on March 25, 2009, alleging defendant to be an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5). An arrest warrant issued on the same date, and defendant was then transferred to the custody of the U.S. Marshal's Service on March 27, 2009. On April 16, 2009, an Eastern District of Virginia grand jury returned a one-count indictment against defendant, charging him with unlawful possession of a firearm and ammunition by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

On June 8, 2009, defendant filed the instant motion to suppress the firearm, arguing that the warrantless impound-lot search violated his Fourth Amendment right against unreasonable searches. Defendant's opening brief in support of his motion addressed what defendant anticipated would be the government's sole justification for the warrantless search of his vehicle, namely defendant's wife's alleged consent. The government responded, disavowing any consent-search argument and instead arguing that the warrantless impound-lot search was permissible pursuant to the "automobile exception" to the Fourth Amendment's warrant requirement because the officers had probable cause to believe defendant's vehicle contained contraband, namely a firearm he possessed as an illegal alien, in violation of § 922(g)(5). Defendant replied, arguing that the Supreme Court's recent decision in *Arizona v. Gant*, ___ U.S. ___, 129 S. Ct. 1710 (2009), limited exceptions to the Fourth

Amendment's warrant requirement, rendering the "automobile exception" inapplicable where, as here, a vehicle has been impounded. On June 19, 2009, the parties appeared for a hearing on defendant's motion, and live testimony was adduced from both Special Agent Shelley and Officer Dyer. In addition, in the course of argument, the parties were directed to provide supplemental briefing with respect to the import of *Gant* on defendant's motion. The parties complied, and the matter is now ripe for disposition. Further oral argument is dispensed with, as the facts and legal contentions are adequately set forth in the existing record and additional oral argument would not aid the decisional process.

## II.

It is well-settled that "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967), *quoted in Gant*, 129 S. Ct. at 1716. Pertinent here is the so-called "automobile exception," which the Supreme Court first recognized in *Carroll v. United States*, 267 U.S. 132 (1925). And since *Carroll*, the Supreme Court has consistently upheld the exception, applying it to permit warrantless vehicle searches where "[i] a car is readily mobile and [ii] probable cause exists to believe it contains contraband[.]" *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390–93 (1985) (tracing the history of the exception)), *quoted in United States v. Brookins*, 345 F.3d 231, 235 (4th Cir. 2003).[11] Importantly, with respect

---

[11] *See also, e.g., Maryland v. Dyson*, 527 U.S. 465 (1999) (*per curiam*); *United States v. Johns*, 469 U.S. 478 (1985); *Florida v. Meyers*, 466 U.S. 380 (1984) (*per curiam*); *Michigan v. Thomas*, 458 U.S. 259 (1982) (*per curiam*); *United States v. Ross*, 456 U.S. 798 (1982); *Texas v. White*, 423 U.S. 67 (1975) (*per curiam*); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971); *Chambers v. Maroney*, 399 U.S. 42 (1970).

to the "readily mobile" requirement, the Supreme Court has clearly recognized that most vehicles are "obviously readily mobile by the turn of an ignition key, if not actually moving." *Carney*, 471 U.S. at 393. Thus, a vehicle's "ready mobility"

> does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (*per curiam*) (citing *United States v. Ross*, 456 U.S. 798, 807 n. 9 (1982); *Texas v. White*, 423 U.S. 67 (1975) (*per curiam*)). Accordingly, as the Fourth Circuit has recognized, "the fact that impoundment may . . . ma[ke] it virtually impossible for anyone to drive [a] car away or to tamper with its contents is irrelevant to the constitutionality of a warrantless search" of an impounded vehicle where that search is supported by probable cause. *United States v. Gastiaburo*, 16 F.3d 582, 586 (4th Cir. 1994) (citing *Thomas*, 458 U.S. at 261) (rejecting argument that "impoundment effectively transform[s] [a] car from a movable vehicle into a fixed piece of property"). Rather, the Fourth Circuit has held the "readily mobile" requirement is satisfied where a vehicle is "clearly operational." *Brookins*, 345 F.3d at 238.

These principles, applied here, compel the conclusion that the warrantless impound-lot search of defendant's vehicle in this case was permissible pursuant to the automobile exception. First, it is pellucidly clear that the officers had probable cause to believe defendant's vehicle contained contraband, namely a firearm that he unlawfully possessed as an illegal alien, in violation of § 922(g)(5). Second, it is equally clear, applying *Carney*, *Thomas*, *Gastiaburo*, and *Brookins*, that although defendant's vehicle had been impounded, it was nonetheless "clearly operational" and hence "readily mobile." Indeed, there is no question (nor does defendant argue) that both of the

automobile exception's requirements, as they have been interpreted by the applicable pre-*Gant* Fourth Circuit and Supreme Court authority, are satisfied here. Rather, defendant's sole argument in support of his motion to suppress is that the Supreme Court's decision in *Gant* mandates a narrowing of the "readily mobile" requirement. More specifically, defendant relies on the reasoning in *Gant*, where the Supreme Court arguably narrowed a different exception to the Fourth Amendment's warrant requirement—the "search incident to arrest" exception—because that exception's applicability in the vehicle context had, over time, been "untether[ed] . . . from the justifications underlying" it. 129 S. Ct. at 1719. Defendant argues that because the "readily mobile" requirement of the automobile exception has been similarly untethered from that exception's underlying justifications, that requirement must be narrowed and held unsatisfied where, as here, a vehicle has been impounded. Yet, as explained below, defendant's novel argument in this regard, although well-argued, must be rejected, as it misapprehends both (i) the import of *Gant*, which explicitly reaffirmed the automobile exception, rather than narrowing it; and (ii) the nature of the automobile exception's underlying justifications, which are not undermined by the exception's application to the facts of this case.

First, in *Gant* the Supreme Court squarely addressed the scope of the "search incident to arrest" exception to the warrant requirement in the vehicle context, holding that exception to permit warrantless vehicle searches "incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 129 S. Ct. at 1723. In so holding, the Supreme Court rejected the government's argument that the search incident to arrest exception should permit a warrantless vehicle search incident to the arrest of any recent vehicle occupant "regardless of the

possibility of [arrestee] access in a given case because [an] expansive rule correctly balances law enforcement interests, including the interest in a bright-line rule, with an arresstee's limited privacy interest in his vehicle." *Id.* at 1720. Rather, the Supreme Court held that the government's position, which was supported by numerous lower courts' broad application of the search incident to arrest exception,[12] would "untether the [search incident to arrest exception] from the justifications underlying" it. *Id.* at 1719.[13] Moreover, in rejecting the government's argument in *Gant* that a broad reading of the search incident to arrest exception was necessary "to protect law enforcement safety and evidentiary interests," the Supreme Court explained that several "[o]ther established exceptions," including the automobile exception, "together ensure that officers may search a vehicle when genuine safety or evidentiary concerns encountered during the arrest of a vehicle's recent occupant justify a search." *Id.* at 1721. With respect to the automobile exception, the Supreme Court reaffirmed that where "there is probable cause to believe a vehicle contains evidence of criminal activity, [the automobile exception] authorizes a search of any area of the vehicle in which the evidence might be found." *Id.* (citing *Ross*, 456 U.S. at 820–21) (internal citation omitted). In addition, the Supreme Court observed that, as compared to the search incident to arrest exception, the automobile exception "allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader." *Id.* Thus, far from suggesting that the

---

[12] In this respect, the Supreme Court acknowledged that lower courts generally had read *New York v. Belton*, 453 U.S. 454 (1981), which upheld a warrantless vehicle search in that case as a proper search incident to an arrest, to authorize "a vehicle search . . . incident to every arrest of a recent occupant notwithstanding that in most cases the vehicle's passenger compartment will not be within the arrestee's reach at time of the search." *Gant*, 129 S. Ct. at 1719.

[13] More specifically, the Supreme Court held in *Gant* that the search incident to arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." 129 S. Ct. at 1716.

automobile exception should be *narrowed*, the Supreme Court's decision in *Gant* directly cited the automobile exception's *breadth* as a reason that the search incident to arrest exception need not be read as broadly as the government urged.[14]

Defendant counters by arguing that although *Gant* reaffirmed the vitality of the automobile exception *generally*, the Supreme Court's *reasoning* in *Gant*, by observing that exceptions to the warrant requirement must be tethered to their underlying justifications, mandates a narrowing of the automobile exception's "readily mobile" requirement to exclude warrantless searches of impounded vehicles. Put differently, defendant argues that the automobile exception's application to non-roadside searches has untethered the exception from its original justification in *Carroll*, where a warrantless *roadside* search based on probable cause was held permissible based on the impracticability of requiring a warrant to be obtained in such a situation.[15] Yet, defendant's argument

---

[14] Although neither party has cited any post-*Gant* authority addressing the automobile exception's applicability to impounded vehicles (nor has a search revealed any such authority), numerous courts have acknowledged that *Gant* generally reaffirmed the automobile exception's vitality. *See, e.g., United States v. Kellam*, 568 F.3d 125, 136 n. 15 (4th Cir. 2009); *United States v. Martinez-Cortes*, 566 F.3d 767, 771 n. 3 (8th Cir. 2009); *see also, e.g., United States v. Sinclair*, No. 2:08cr144, 2009 WL 1393438, at *5 n. 2 (D.S.C. May 18, 2009); *United States v. Lindsey*, No. 08cr97, 2009 WL 1616121, at *2 (D. Del. June 9, 2009); *United States v. Cowart*, No. 1:08cr10119, 2009 WL 1588647, at *10 (W.D. Tenn. June 5, 2009).

[15] More specifically, defendant relies on the Supreme Court's observation in *Carroll* that

> the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a *necessary difference* between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, *because the vehicle can be quickly moved* out of the locality or jurisdiction in which the warrant must be sought.

267 U.S. at 153 (emphasis added), *quoted in Carney*, 471 U.S. at 390 ("The capacity to be 'quickly moved' was clearly the basis of the holding in *Carroll*, and our cases have consistently recognized

misapprehends both the scope of *Gant*'s reasoning and the nature of the justifications underlying the automobile exception. First, *Gant* does not stand for the proposition that *all* exceptions to the Fourth Amendment's warrant requirement are forever limited to the factual circumstances of the seminal cases recognizing those exceptions. To the contrary, *Gant* only limited the evolution of the search incident to arrest exception because the broad reading rejected in that case "would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis." 129 S. Ct. at 1721. Second, application of the automobile exception to the facts of this case, far from providing a police entitlement, serves the historical justifications underlying the automobile exception, namely (i) the inherent exigency posed by a vehicle's ready mobility, and (ii) persons' generally reduced expectation of privacy in automobiles. *See Carney*, 471 U.S. at 390–93. With respect to the former, it is important to remember, as discussed *supra*, that the mobility justification is based on "the nature of the *use* of [a] vehicle, rather than its ability to be moved by a [particular] defendant upon stop or seizure." *Brookins*, 345 F.3d at 237 n. 7. This justification is clearly satisfied where, as here, a vehicle is not just clearly operational, but is also being held at a privately owned and unlocked impound lot, thus implicating the mobility justification's genuine evidentiary concerns.[16] And with respect to the automobile exception's second

---

ready mobility as one of the principal bases of the automobile exception."); *see also, e.g., Chambers*, 399 U.S. at 51 (observing that "the opportunity to search is fleeting since a car is readily movable").

[16] Indeed, it is well-settled that apart from the inherent ready mobility of a clearly operational vehicle, "the automobile exception does not have a separate exigency requirement." *Dyson*, 527 U.S. at 467 (citing *Labron*, 518 U.S. at 940). Rather, the "automobile's 'ready mobility[]' [is itself] an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear." *Labron*, 518 U.S. at 940. Instructive in this regard is the Supreme Court's distinction of the ready mobility of vehicles in particular from the mobility of smaller containers generally in *United States v. Chadwick*, 433 U.S. 1 (1977), on the ground that "the size and inherent mobility of a vehicle make it susceptible to theft or intrusion by vandals" and that "[a]bsolutely secure storage

justification, the general reduced expectation of privacy in automobiles, the Supreme Court has observed that this justification "derive[s] . . . from the pervasive regulation of vehicles capable of traveling on the public highways" and "has historically turned . . . on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation." *Carney*, 471 U.S. at 392, 394 (citing *Cady v. Dombrowski*, 413 U.S. 433, 440–41 (1973)); *see also Labron*, 518 U.S. at 940. Thus, where, as here, "a vehicle is being used on the highways," the second justification for the automobile exception is satisfied. *Carney*, 471 U.S. at 392.[17]

Finally, the Supreme Court's decision in *Gant* also appears to refer approvingly—albeit somewhat obliquely—to the mobility and reduced expectation of privacy justifications that animate

---

facilities may not be available" for many vehicles. *Id.* at 13 n. 7.

[17] Of course, it is worth noting that the result reached here does not address certain hypothetical scenarios where, unlike here, application of the automobile exception might untether the exception from its underlying justifications (similar to the broad application of the search incident to arrest exception urged by the government in *Gant*). For example, this opinion does not address the automobile exception's applicability where, unlike here, a vehicle is in secure police custody at a station house or evidence lab and "by no possible stretch of the legal imagination can [the situation] be made into a case where 'it is not practicable to secure a warrant,' and the 'automobile exception,' despite its label, is simply irrelevant." *Coolidge*, 403 U.S. at 462 (quoting *Carroll*, 267 U.S. at 153). Nor does this opinion address a scenario where, unlike here, a vehicle such as a motor home "is situated in a way or place that objectively indicates that it is being used as a residence." *Carney*, 471 U.S. at 394 n. 3 (observing that "[a]mong the factors that might be relevant in determining whether a warrant would be required in such a circumstance [are] . . . whether the vehicle is . . . is elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road"). In addition, the result reached here also does not reach scenarios where, unlike here, the setting in which a vehicle is searched objectively indicates a higher expectation of privacy (such as where a vehicle is found on residential property). *Cf. Coolidge*, 403 U.S. at 458–64. Thus, defendant's reliance on cases that have found various other exceptions to the warrant requirement to be limited by *Gant*'s reasoning are inapposite. *See, e.g., United States v. Fofana*, ___ F. Supp. 2d ___, No. 2:09cr49, 2009 WL 1529815, at *8 (S.D. Ohio June 2, 2009) (applying *Gant*'s reasoning to limit warrantless searches at airport checkpoints); *New Hampshire v. Robinson*, ___ A. 2d ___, No. 2008-9, 2009 WL 1636645 (N.H. June 12, 2009) (citing *Gant*'s reasoning for guidance in determining applicability of state-law exigency exception to warrant requirement).

the automobile exception. More specifically, in *Gant* the Supreme Court "conclude[d] that *circumstances unique to the vehicle context* justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" 129 S. Ct. at 1719 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)) (emphasis added). And although the Supreme Court did not squarely elucidate what it meant by "circumstances unique to the vehicle context," the Supreme Court's citation in *Gant* to Justice Scalia's *Thornton* concurrence makes clear that the unique circumstances are the mobility and reduced expectation of privacy justifications that similarly animate the automobile exception. *See Thornton*, 541 U.S. at 631 (Scalia, J., concurring in judgment) (observing that "motor vehicles [are] a category of 'effects' which give rise to a reduced expectation of privacy and heightened law enforcement needs" (citing *Wyoming v. Houghton*, 526 U.S. 295, 303, 304 (1999) ("As in all car-search cases, the 'ready mobility' of an automobile creates a risk that the evidence or contraband will be permanently lost while a warrant is obtained." (citing *Carney*, 471 U.S. at 390)))). Thus, just as those "circumstances unique to the vehicle context" justify a warrantless search incident to arrest where "it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle," those same circumstances justify a warrantless search of any readily mobile automobile where "there is probable cause to believe [the] vehicle contains evidence of criminal activity[.]" *Gant*, 129 S. Ct. at 1719, 1721.

In sum, the warrantless impound-lot search of defendant's vehicle in this case was plainly permissible pursuant to the automobile exception[18] to the Fourth Amendment's warrant requirement,

---

[18] Notably, in addition to disavowing any consent-search theory, the government also has not argued that the impound-lot search was permissible pursuant to the "inventory search" exception to the warrant requirement, which permits warrantless vehicle searches where (i) "the vehicle is in

and the Supreme Court's decision in *Gant* does not undermine application of the automobile exception to the facts of this case. Accordingly, defendant's motion to suppress the firearm found in his vehicle must be denied.

An appropriate Order will issue.

July 9, 2009  
Alexandria, VA

/s/  
T. S. Ellis, III  
United States District Judge

---

lawful custody" of the police; (ii) the search in question was "conducted pursuant to standard police procedures"; and (iii) the "purpose of the inventory [was] to secure the car or its contents and not to gather incriminating evidence against the owner." *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986) (citing *South Dakota v. Opperman*, 428 U.S. 364, 374–76 (1976)), *quoted in United States v. Murphy*, 552 F.3d 405, 412 (4th Cir. 2009). To be sure, the facts of this case suggest that a warrantless inventory search of defendant's vehicle was permissible, and Officer Dyer testified both (i) that he was unable to complete the roadside inventory search (which defendant concedes was proper) and (ii) that he considered the impound-lot search to be a continuation of the inventory search. Yet, because the record reflects that the officers failed to conduct the impound-lot search here pursuant to standard police procedures for inventory searches, namely the completion of a 6143 form or the documentation of any items found other than the firearm, the inventory-search exception is inapplicable on these facts. Thus, it is unnecessary to address whether, in light of the evidence adduced on this record, the "purpose of the inventory search [was] to secure the car or its contents and not to gather incriminating evidence against the owner." *Brown*, 787 F.2d at 932.